HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
GRIFFIN ESTES, CA Bar #322095
Assistant Federal Defender
Office of the Federal Defender
2300 Tulare Street, Suite 330
Fresno, CA 93721-2226
Telephone: (559) 487-5561
Fax: (559) 487-5950

Attorneys for Defendant
DARREN SEVER

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DARREN SEVER,<br><br>Defendant. | Case No. 1:24-cr-00232-KES-EPG<br><br>REPLY TO THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS<br><br>Date: September 14, 2026<br>Time: 11:00 a.m.<br>Judge: Hon. Kirk E. Sheriff |

## TABLE OF CONTENTS

PAGE

A. This Case Highlights How the Third-Party Doctrine Is Unworkable in the Digital Age ........ 1

B. The Third-Party Doctrine Is Inapplicable ........ 3

1. WebPurify Operates as a Government Agent ........ 3

2. The Government Has Failed to Meet Its Burden of Establishing that the Private Search Exception Applies, Because the Government Has Not Demonstrated that Any Person Actually Viewed the Relevant File Before it Was Provided to Law Enforcement ........ 8

3. Even if the Process was Followed, The File Viewed By the Content Moderation Team at WebPurify Was Not the Same as the File Viewed By Law Enforcement ........ 14

C. This Court Should Conduct a Franks Hearing ........ 15

D. CONCLUSION ........ 16

# TABLE OF AUTHORITIES

PAGE

## FEDERAL CASES

*Carpenter v. United States*
585 U.S. 296 (2018)....................2

*Chatrie v. United States*
146 S. Ct. 2193 (2026)....................1, 2, 16

*Coolidge v. New Hampshire*
403 U.S. 443 (1971)....................3

*Dow Chem. Co. v. United States*
476 U.S. 227 (1986)....................13

*United States v. Burley*
No. 21-CR-00198-EMC-1
2023 WL 3792641 (N.D. Cal. June 2, 2023)....................12, 13

*United States v. Cleaveland*
38 F.3d 1092 (9th Cir. 1994)....................3, 6, 8

*United States v. Guard*
152 F.4th 375 (2nd Cir. 2025)....................3, 5

*United States v. Lefkowitz*
618 F.2d 1313 (9th Cir.)
449 U.S. 824 (1980)....................15

*United States v. Leon*
468 U.S. 897 (1984)....................16

*United States v. Miller*
688 F.2d 652 (9th Cir. 1982)....................3, 5

*United States v. Panuco*
No. 1:24-cr-00090-JAM-BAM
2025 WL 2779979 (E.D. Cal. Sep. 30, 2025)....................11

*United States v. Reed*
15 F.3d 928 (9th Cir. 1994)....................3, 6

*United States v. Rosenow*
50 F.4th 715 (9th Cir. 2022)....................6, 7, 8

## TABLE OF AUTHORITIES (*CONT'D.*)

**PAGE**

### FEDERAL CASES (*cont'd.*)


*United States v. Walther*
652 F.2d 788 (9th Cir. 1981) .......... 6

*United States v. Wilson*
13 F.4th 961 (9th Cir. 2021) .......... 1, 8, 12, 14


### FEDERAL STATUTES AND RULES


Fourth Amendment .......... *passim*

Darren Sever hereby submits his reply to the government's opposition, filed July 31, 2026, *see* Dkt. # 59, to his motion to suppress, filed June 26, 2026, *see* ECF Dkt. #50. For the reasons set forth below, and in Mr. Sever's motion to suppress, this Court should suppress the evidence obtained as a result of the warrantless search carried out by Fresno County Sheriff's Office Detective Rosario on or about June 27, 2024.

The parties agree that Mr. Sever had a reasonable expectation of privacy in the document that was uploaded to Synchronoss servers. Mr. Sever did not share an image with anyone. The extent of the parties' disagreement is whether the third-party doctrine applies to the facts of this case. That being said, based on the government's opposition, highlighting the previously undisclosed role of WebPurify, the third-party doctrine does not apply.

Before explaining why the third-party doctrine does apply here, as a preliminary matter, the facts of this case demonstrate why the third-party doctrine is "indefensible." *Chatrie v. United States*, 146 S. Ct. 2193, 2219 (2026) (Gorsuch, J., concurring). Even if the Court does not overrule the third-party doctrine, the third-party doctrine is inapplicable in this case for three reasons. First, WebPurify's close relationship with law enforcement makes it an arm of the government. Second, the government has failed to demonstrate that a person at WebPurify actually viewed the image in question as is required by *United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021). Third, publicly available information shows that, if human review occurred at all, the content moderation team at WebPurify is presented with altered versions of alleged CSAM, thus the government cannot show that the content moderators viewed the same image as law enforcement in this case. Each of these reasons provides an independent basis to grant Mr. Sever's motion to suppress.

**A. This Case Highlights How the Third-Party Doctrine Is Unworkable in the Digital Age.**

The investigation in this case began when an image was present on a server maintained by Synchronoss, a third-party company that provided Verizon's cloud-storage service. Verizon, the Internet Service Provider, outsourced the storage and management of its customers' cloud

content to Synchronoss. ECF Dckt. #50-1, at 5.[1] A third company, WebPurify, contracted solely for the purposes of content moderation, ultimately reviewed the image and started the investigation into Mr. Sever. ECF Dckt. # 59, p. 2. The image was never publicly shared through messaging applications nor intentionally uploaded to the Synchronoss server. The government does not argue that Mr. Sever lacked a Fourth Amendment interest in the file – simply that the Fourth Amendment doesn't apply because a private party did the requisite search on the government's behalf. ECF Dckt. # 59, at 3-4. The government's theory advances an expansive conception of the government's surveillance powers. Under that theory, because Mr. Sever possessed a device connected to the internet, the government may conduct a warrantless search of images on that device merely because those images were, at some point, stored on a server. In other words, the government claims a "virtual panopticon" "with which to scrutinize" a cell-phone user's activity. *Chatrie v. United States*, 146 S. Ct. 2193, 2210 (2026). The government says this is allowed because of the third-party doctrine. ECF Dckt. # 59, at 3. But the continued vitality of third-party doctrine has recently been questioned. *See Chatrie v. United States*, 146 S. Ct. 2193, 2219-2220 (2026) (Gorsuch, J., concurring) ("Does the Court just mean to give Katz's third-party doctrine a quiet burial by suggesting today that any information shared over "smartphones" using "apps and services" falls outside its reach?"). Extending the third-party doctrine to a case like this is dangerous. "In no meaningful sense" did Mr. Sever "voluntary[il]y expose" his personal data to a third-party. *Carpenter v. United States*, 585 U.S. 296, 315 (2018). "The mere act of accessing a network does not in itself extinguish privacy expectations […] ." *United States v. Heckenkamp*, 482 F.3d 1142, 1146-47 (9th Cir. 2007) (internal citation and quotation marks omitted) (holding that a student did not lose his reasonable expectation of privacy in information stored on his computer despite a university policy that it could access his computer while connected to the university's network). The fact that Mr. Sever never posted, shared, or purposefully uploaded this photo to the internet is significant. "A cell-phone user is not to be viewed as sharing private information with third parties—which then can be freely passed on to the government—just by doing the ordinary things cell-phone users do." *Chatrie*,

[1] Nobody from Verizon or Synchronoss viewed the image at issue. ECF Dckt. #50-1, p. 65-74.

146 S. Ct. at 2214–15. Yet the Government's argument would confer enormous power: so long as a cell-phone user's device accesses an internet server, even unknowingly, the Government could search any files that pass through that server. That proposition is particularly troubling in an era when internet-connected devices routinely back up photos and other data to remote servers—the "cloud"— without any affirmative action by the user to upload them.

**B. The Third-Party Doctrine Is Inapplicable.**

**1. WebPurify Operates as a Government Agent.**

The government argues that because a third-party, WebPurify, accomplished the initial search, the Fourth Amendment does not apply. ECF Dckt. # 59. WebPurify, however, is mission-driven to help law enforcement in this field. As a result, in the course of the search at issue in this case, WebPurify was acting as an instrument or agent of law enforcement. Because of this, the third-party doctrine does not apply.

"Where a private party acts as an 'instrument or agent' of the state in effecting a search or seizure, Fourth Amendment interests are implicated." *United States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir. 1994) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)). The Ninth Circuit considers, among other things, "(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Id.*, (quoting *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994)). A private party becomes an instrument of the government when the circumstances demonstrate that the private party is acting on the government's behalf rather than merely pursuing its own private interests. *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982). At its core, WebPurify is a company whose stated purpose is to locate CSAM online, and it works closely with law enforcement and NCMEC to do so. *See United States v. Guard*, 152 F.4th 375, 288 (2nd Cir. 2025) (finding that NCMEC is governmental entity for the purposes of the Fourth Amendment.) The declaration submitted by WebPurify, and the information the company publicly provides about its operations, demonstrates the extent of that relationship. ECF Dckt. # 59-1, Exhibits A-D. Taken together, these facts support the conclusion that WebPurify is acting as a government agent. WebPurify does not merely provide a neutral,

commercial content-moderation service. It *exists* to identify child exploitation and facilitate law-enforcement action. As one WebPurify founder explained, "[t]his is why we started this company, and to find out we're responsible for over 500 arrests in the last year alone is so gratifying." *See* Exh. A, at 2.[2] The company emphasizes that its moderators must be "mission-driven and fully invested," explaining that "[i]t's not about financial gain, it's about your passion for having an impact." *Id.* According to WebPurify's own materials, its team identified more than one million pieces of CSAM that led to more than 500 arrests in 2022. *Id.* That volume underscores the nature of WebPurify's operation. Identifying CSAM is not incidental to the company's business**;** reporting suspected CSAM to law enforcement is central to its operation. Indeed, the company reminds its employees that their work matters precisely because it can lead to arrests. Exh. C, p. 31-34. This is not merely a company performing an ordinary business function that happens to result in the discovery of contraband; identifying and reporting CSAM to law enforcement is the very purpose of the service it provides.

In addition to its desire to assist law enforcement, WebPurify coordinates with law enforcement. WebPurify expressly states that it performs its review "in support of Verizon's generation of CyberTips to NCMEC." ECF Dckt. # 59-1, ¶ 2. Its moderators receive training in NCMEC categories, *Id.*, ¶ 4, and WebPurify categorizes suspected CSAM using NCMEC's criteria, *Id.*, ¶ 6. Thus, WebPurify is not independently deciding how to identify or classify potentially illegal material. It has been integrated into the process by which it identifies, categorizes, and reports suspected CSAM to NCMEC and, ultimately, law enforcement. NCMEC also supports WebPurify in their detection efforts by providing data that WebPurify uses to scan the internet for CSAM. According to WebPurify: "[NCMEC] has created and maintains a list of PhotoDNA signatures for the 'worst of the worst' child sexual abuse imagery. WebPurify has now integrated this PhotoDNA technology with our image moderation service to help prevent child exploitation online and is working closely with NCMEC to help users report images identified by it." Exh. B, p. 2.[3] In fact, WebPurify even allows its customers to access the

---

[2] This .pdf file can be located on the at https://www.webpurify.com/collateral/WebPurify_CSAM_Team.pdf, available at https://www.webpurify.com/resources/faces-behind-the-filters/ (Accessed August 11, 2026.)

[3] Available at https://www.webpurify.com/blog/webpurify-adds-photodna-to-prevent-child-exploitation-online/

government created data free of charge. *Id*. WebPurify's relationship with NCMEC is not merely incidental. WebPurify's co-founder states: "NCMEC and WebPurify are aligned in our mission to keep users, specifically children and young audiences, safe online." *Id*. He further explained that WebPurify must be "vigilant in the fight against predators," must "monitor [user-generated content]," and must "report child exploitation circulating in cyberspace." *Id*. Further, WebPurify is "pleased to be *working with NCMEC* to address this very serious issue." *Id*. (emphasis added.) In sum, WebPurify has incorporated NCMEC's PhotoDNA technology into its image-moderation service, uses NCMEC-derived classifications, trains its moderators in NCMEC procedures, and states that it works closely with NCMEC to facilitate reporting of images identified through its system. *Id*. Indeed, the close relationship between WebPurify and NCMEC is what distinguishes this case from *Guard*, 152 F.2d 375 (where the court determined NCMEC and social media site Kik did not have a sufficiently close nexus such that Kik became a government agent.) WebPurify performs the investigative function that neither Synchronoss nor Verizon performs itself, using training, categories, and procedures developed in coordination with NCMEC, for the express purpose of generating CyberTips and facilitating law-enforcement investigations. WebPurify therefore cannot plausibly be characterized as a detached third-party service provider whose independent actions merely happen to provide information to the government. Its role is substantially intertwined with the government's CSAM-detection and reporting process. The evidence supports the conclusion that WebPurify was acting as an instrument or agent of the government when it conducted the searches at issue here.

These facts establish far more than the incidental relationship between a private party and law enforcement that the Ninth Circuit found insufficient in *Miller*. There, the private individual acted on his own initiative to locate his stolen property, and his prior contacts with law enforcement did not demonstrate that he was acting as an instrument of the government. *Miller*, 688 F.2d at 657. The private party's independent purpose was apparent: he was attempting to recover his own stolen property. *Id.* Similarly, the Ninth Circuit has upheld third party searches where the private party that conducts the initial search has a "legitimate, independent

motivation." *United States v. Cleaveland*, 38 F.3d 1092, 1094 (9th Cir. 1994) (where a utility company was investigating power diversion and theft of its electricity.)

WebPurify presents the opposite circumstance. Its very business model is the identification of CSAM for purposes of reporting that material to NCMEC and facilitating law-enforcement action. The company's own measure of success—identifying CSAM that results in arrests—demonstrates that assisting criminal investigations is not an incidental consequence of WebPurify's work. It is a central objective. This is precisely what takes this case outside of the third-party doctrine. For example, in *United States v. Walther*, 652 F.2d 788, 792–93 (9th Cir. 1981), the Ninth Circuit said that a private carrier's interest in preventing criminal activity was not a legitimate independent motivation. As noted, WebPurify is scanning a person's digital files—without their knowledge—in order to locate CSAM, and report it law enforcement, in furtherance of a law enforcement objective. Exh. C, p. 31-34. As the Ninth Circuit has said, this sort of "snooping" is not a legitimate motive and finding evidence of criminal activity is not independent. *United States v. Reed*, 15 F.3d 928, 932 (9th Cir. 1994).

This case is unlike *United States v. Rosenow*, 50 F.4th 715 (9th Cir. 2022). There, the Ninth Circuit examined the particular relationship between the government and Yahoo and Facebook and concluded that the government's involvement in those companies' searches was not sufficiently extensive to constitute governmental action. *Rosenow,* 15 F.3d at 729–35. But *Rosenow* does not establish a categorical rule that an internet company can never become a government agent merely because it works with law enforcement. In *Rosenow*, Yahoo independently initiated its investigation after receiving information from another private company. *Id.* at 733–34. There was no evidence that law enforcement participated in Yahoo's investigation or sought assistance from Yahoo outside legal process. *Id.* Yahoo also had an independent contractual interest in enforcing its terms of service and investigating illegal activity. *Id.* The Ninth Circuit therefore concluded that Yahoo's conduct remained private. Facebook likewise had an independent reason to act. Although the FBI sent Facebook a preservation request identifying child-safety concerns, the FBI did not request that Facebook search Rosenow's accounts. Facebook searched the accounts because its own internal policies

required it to review accounts after receiving notice of conduct threatening child safety. *Id*., at 734. The Ninth Circuit therefore concluded that the government's involvement was not sufficiently extensive to trigger Fourth Amendment scrutiny.

The critical difference here is that WebPurify's investigative function is itself tied to the governmental reporting process and that WebPurify has the "mission" of locating CSAM online. Exh. A, p. 2. Moreover, WebPurify and NCMEC work in coordination. WebPurify's personnel were trained in the NCMEC categories, WebPurify employed NCMEC's classification framework, and that WebPurify conducted its work "in support of" Verizon's generation of CyberTips to NCMEC. ECF Dckt. #59-1, ¶¶ 2, 4, 6. Those facts are powerful evidence that WebPurify's investigative function was designed to facilitate law-enforcement investigations rather than merely to advance an independent private business interest. Indeed, WebPurify's involvement effectively removes Verizon from the critical step of viewing the images. Verizon acknowledges that it "does not view actual pictures" and "does not view any pictures uploaded to a cloud service." ECF Dckt. # 50-1, at 69. WebPurify, not Verizon or Synchronoss, is the relevant actor for the purposes of the third-party doctrine. And, the only business interest that WebPurify has is to find and locate CSAM viewers online in coordination with NCMEC – this is not an independent private business interest.

*Rosenow* reinforces rather than defeats Mr. Sever's argument. The Ninth Circuit repeatedly relied on the existence of independent private interests as a reason for treating Yahoo and Facebook as private actors. *See Rosenow*, at 734–35. The court explained that a private party's legitimate independent motivation is not eliminated merely because law enforcement may benefit from the party's conduct. *Id.*, at 735. Here, however, the record raises a fundamentally different question: What independent private interest caused WebPurify to conduct this particular investigative activity? WebPurify's own materials identify the answer. It was created to find CSAM. Exh. A, p. 2 ("This is why we started this company…".) Its personnel are trained for that purpose. Its work is performed in support of CyberTips. Its personnel classify material according to NCMEC's categories. And the company celebrates the arrests resulting from the material it identifies. Exh. A, p. 2; Exh. C, p. 34. Those facts support the inference that assisting

the governmental response to child exploitation is not merely an incidental benefit of WebPurify's business; it is an essential purpose of the investigative function at issue.

Here, clearly, the government "knew of and acquiesced in" the private party's intrusive conduct. *Cleaveland*, 38 F.3d at 1093. WebPurify acquired the PhotoDNA hashmatching data from the NCMEC. WebPurify boasts that it is "working closely with NCMEC." Exh. B, p, 2. Clearly then, the government "knew of and acquiesced" in the WebPurify's conduct. Moreover, this the very definition of "active participation or encouragement" by the government. *Rosenow*, 50 F. 4th at 733. Further, WebPurify "intended to assist law enforcement efforts […]." *Cleaveland,* 38 F.3d at 1093.WebPurify's own words provide unusually direct evidence on this question. This case therefore cannot be reduced to the proposition that WebPurify is a private company that voluntarily reports crimes. Because WebPurify searched Mr. Sever's data for the purpose of identifying evidence that could be converted into a CyberTip and ultimately used by law enforcement, then the search was performed for a governmental investigative purpose. As a result, the government needed a warrant to perform this search. Because it did not have one, the Fourth Amendment was violated.

**2. The Government Has Failed to Meet Its Burden of Establishing that the Private Search Exception Applies, Because the Government Has Not Demonstrated that Any Person Actually Viewed the Relevant File Before it Was Provided to Law Enforcement.**

The government concedes that the search at issue was without a warrant. ECF Dckt. # 59*,* p. 3, l. 13. Under such circumstances, the search is *per se* unreasonable and "[t]he government bears the burden to prove [Det. Rosario's] warrantless search was justified by the private search exception to the Fourth Amendment's warrant requirement." *Wilson*, 13 F.4th 961, 971.

On the record before the Court, the government has fallen far short of meeting this burden of demonstrating that a person at a company actually viewed the file in question before it was provided to NCMEC and thereafter sent to the Fresno County Sheriff's Office. The government provided an affidavit of Jonathan Ferger in support of its argument. ECF Dckt. # 59-1. Mr. Ferger explained that there *was* a log of "when a specific employee has viewed content before that content is reported to NCMEC, including content reviewed in June of 2024." ECF

Dkct. # 59-1 at 1, ¶ 8. However, WebPurify "has a 60-day retention policy for its content review records and information" related to this case no longer exists. *Id*. In other words, WebPurify deleted whatever log that they created which could actually prove human review occurred in this case. Instead, the government and the company suggest that there is internal software that forces human review prior to creating a NCMEC report, leading the government to conclude that "an employee of WebPurify necessarily reviewed the relevant file." ECF Dckt. #59, p.4, l. 11. Thus, the government argues, Det. Rosario viewed the "exact same file" that the content moderators at WebPurify saw. *Id*., p.5, l. 10.

The government has failed to meet it's burden for two primary reasons. First, the provided information is insufficient – without a specific record of human review, there is insufficient evidence for the government to meet it's burden. Second, as is argued below, there is insufficient proof that the same file reviewed by the content moderators was reviewed by Det. Rosario.

Jonathan Ferger's declaration paints a misleadingly simple picture of the content moderation service that his California-based company outsources to a group of six people in India. ECF Dckt. # 59-1, ¶ 4. Additional context regarding the company is needed to assess the government's central claim – that a WebPurify employee necessarily looked at the photo because their internal software may require that to happen. *Id*., ¶ 7. Recall that WebPurify is a company that is employed by incredibly large technology companies, like Microsoft, and governmental organizations, like the U.S. Army and the GSA.[4] It is "trusted by hundreds of world's most respected organizations."[5] And it reviews millions CSAM of files. Exh. A, p 2. Yet, according to the declaration, only six individuals in India perform WebPurify's CSAM content moderation. ECF Dckt. # 59-1, ¶ 4.

The volume of material that WebPurify claims to process is enormous, making the proposition that a human necessarily reviewed every CSAM image identified by its systems deserving of careful scrutiny. The task is not merely large; it is inherently taxing. Some content

[4] https://www.webpurify.com/company/ Accessed August 13, 2026.
[5] *Id*.

moderators at WebPurify are permitted to opt out of viewing CSAM altogether. Exh. C, p. 9. Thus, the task may fall on less than the entire six-member moderation team. The company itself recognizes the psychological demands of the work and encourages moderators to take breaks throughout the day and to divert their attention from the content they are reviewing. *See* Exh. C, p. 9. That practice is entirely understandable given the nature of the material. But it necessarily bears on the Government's assertion that every image processed through WebPurify's system was necessarily viewed by a human being. Time spent away from the review process, together with the sheer volume of material WebPurify claims to process, necessarily limits the amount of time its small team of moderators can devote to reviewing individual pieces of content. This is why a "log of when a specific employee […] viewed [the] content" is necessary for the government to meet its burden. *See* ECF Dckt. 59-1, ¶ 6. Mr. Ferger's declaration falls well short of satisfying the government's burden.

Mr. Ferger says "it is not possible for a WebPurify employee to contribute to the generation of a Cybertip without first viewing the image." Dkt. #59-1 at 2, ¶ 7. However, the statement is contradicted by WebPurify's own materials. Further, Mr. Ferger omitted several details about his company's CSAM detection process that further undermines the trustworthiness of the government's central claim. First and foremost, as is shown by their own materials, some NCMEC reports are created without human review at all. Mr. Ferger failed to indicate that his company uses PhotoDNA and AI to assist in the detection process. *See* Exh. A and D. WebPurify says that when there's a PhotoDNA match, its system generates an email and directs the customer to a NCMEC Cybertip form; images that do not match the NCMEC database continue through WebPurify's own human moderation system. Exh. D, p.1.[6] In other words, some PhotoDNA matches result in the creation of Cybertips without human review. *Id*. Further, according to their materials, at least some decisions made by AI are relied on entirely. *See* Exh. A, p. 3. ("AI decisions cannot be solely relied on *unless* a submission is an exact match, right down to every single pixel, to a previously verified CSAM submission.")(emphasis added.)

[6] This website is accessible at https://www.webpurify.com/image-moderation/documentation/photodna/ (accessed August 17, 2026.)

WebPurify claims that some “clearly violative content” does not even undergo human review once it’s flagged by the AI. Exh. E[7], p. 2. How do we know that this did not occur on this occasion? As noted, the government argues that this case involves hash matching. ECF Dckt. # 59, p. 2, l. 21-25. Thus, the process could be entirely automated and the available evidence suggests that human review did not occur at all in this case. Contrary to the claims of Mr. Ferger and the government, it is ‘possible’ for WebPurify to generate a Cybertip without viewing the image that is sent to NCMEC. The significant amount of evidence showing that this process could occur entirely through automated processes is part of what distinguishes this case from *United States v. Panuco*, No. 1:24-cr-00090-JAM-BAM, 2025 WL 2779979 (E.D. Cal. Sep. 30, 2025).

Even if the Court is inclined to believe, without direct evidence, that the photo involved in this case went to secondary human review, what’s to say that on this occasion the content moderators themselves didn’t simply trust the automated AI assisted process and click through the prompts without actually looking at the photo. Exh. A, p.2 (“Potential CSAM is initially flagged by AI.”) The log documenting human review is crucial evidence – how long the content moderator looked at the photo for instance, could tell us whether or not the content moderator had a meaningful opportunity to review the file in question. The human moderator could have relied on a hash match, a confidence marker set by the AI, or some other indicator within the software to avoid actually looking at the content that was sent to create the NCMEC report. There is no basis to assume that the content moderators themselves are immune from cognitive bias or overreliance on the AI system that flags more than a million pieces of potential CSAM for their review each year. At the rate that the WebPurify purports to process CSAM, the content moderators are averaging about one photo every 31.5 seconds, nonstop, 24/7. The fact that WebPurify is unable to provide any records that would be relevant and specific to the viewing of the file at issue here is fatal to the government’s claim that the private search exception is applicable in this case. We don’t know whether the file that was purportedly reviewed by WebPurify was an image or a video. We don’t know what type of file it was. We don’t know if it

[7] This is accessible at https://www.webpurify.com/image-moderation/faq/, last accessed August 17, 2026.

was the same file format that was uploaded to Synchronoss, that was then forwarded to NCMEC.

Although Mr. Ferger's declaration is confident that human review occurred, the Court should not be so certain. Indeed, Mr. Ferger left out crucial facts about the automation process, the fact that some photos are flagged without human review, the integration of PhotoDNA, and, as will be noted below, the way in which Montage materially alters photos. Further, Mr. Ferger appears to be wrong about other basic facts of the reporting process. For instance, he indicates that his belief is that Verizon submits the NCMEC report. ECF Dckt. # 59-1 at 1, ¶ 1. However, Synchronoss, not Verizon, was the company that submitted the NCMEC report. ECF Dckt. # 50-1, at 4. In summary, Mr. Ferger's declaration lacks reliability and fails to satisfy the government's burden in this case.

The inadequacy of the information proffered by the government here is apparent when compared with what records other courts have indicated are relevant to, and probative of, the *Wilson* inquiry. For instance, in *United States v. Burley*, the district court considered a motion to quash brought by Microsoft in response to a defense subpoena for records. *See* No. 21-CR-00198-EMC-1, 2023 WL 3792641, at *1 (N.D. Cal. June 2, 2023). There, in addition to records that would "determine whether Microsoft in fact conducted manual review of each image sent to NCMEC," the defense had sought "Microsoft's policies regarding the review of suspected child pornography." *Id.* at *1. Yet, prior to moving to quash the defense subpoena, Microsoft had already provided the defense with both "a declaration . . . describing . . . the process by which Microsoft reviews suspected images of child sexual exploitation and abuse on its services" as well as "a data log showing that the images were, in fact, manually reviewed." *Id.* at *2. Importantly, the data log provided by Microsoft "confirm[ed] that the four images at issue" actually "went through the[] processes" that were described in Microsoft's general declaration and that the images in question "were manually reviewed." *Id.* at 4. The district court described the level of detail set forth in the data log provided by Microsoft as follows:

> The log confirms when employees submitted their classification decisions, that two of the four images went through the double-blind review process, that the other two went through confirm review process, and that, for each image, the review "process" was "manual." *Id.* Mr. Brown further confirmed that employees visually reviewed the images by "examin[ing] data extracted from

> logs created by the tool used [by employees] to perform these reviews." Id. ¶ 15. Through this examination, he concluded that the images were viewed by analysts in "six unique sessions," the two single review sessions and four double-blind review session (each double-blind review requires two review sessions, since the image is reviewed twice).

*Id.* In light of the information contained within the data log provided by Microsoft—that established that the four images were in fact manually reviewed by not just one employee but several employees at Microsoft—the district court quashed the subpoena to the extent that it sought documents that would only "describe Microsoft's review process generally." *Id.*

In doing so, the district court found it "[c]rucial[]" that Microsoft had "produced a log confirming that the four images at issue went through [the general] processes [described by Microsoft] and were manually reviewed." *Id.* This is because the records provided by Microsoft were "specific and direct evidence" that the "four images specific to this matter" were actually reviewed by employees at Microsoft. *Id.* The district court also found that a description of "Microsoft's general review procedures" would be "unnecessary and have little, if any, probative value" because the question of whether the images at issue were actually reviewed by a person at Microsoft "turn[s] on specific conduct, not general policy." *Id.* (citing to *Dow Chem. Co. v. United States*, 476 U.S. 227, 239 n.5 (1986) ("Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations.")).

The *Burley* court's emphasis on "specific" and "direct" evidence of manual review, rather than on review processes generally, highlights the inadequacy of the information provided by WebPurify that is being presented by the government here. Indeed, Webpurify's brief, non-descriptive, and non-specific declaration that only discusses certain general processes—with no indication that these processes were followed on this occasion—stands in stark contrast to the specific, relevant, and probative information submitted in *Burley*, that included an actual data log that indicated what specific employees did in reviewing the specific images at issue, as well as when they did it, and how they did it. Such information is even more important here since, as is shown below, the file in question – if human review was conducted at all – was likely different than the one that was viewed by Det. Rosario before it was submitted to NCMEC.

**3. Even if the Process was Followed, The File Viewed By the Content Moderation Team at WebPurify Was Not the Same as the File Viewed By Law Enforcement.**

Mr. Ferger's declaration omits a further highly important fact. Specifically, Mr. Ferger failed to mention that his company's internal system Montage alters whatever suspected CSAM was present on a Synchronoss server prior to showing it to a human moderator. This software is referenced both in WebPurify's declaration and in their public statements about their content moderation process. ECF Dckt. # 59-1, ¶ 5, Exh. A, p. 3. The Montage software obscures, alters and modifies the images prior to human review: "for example, Montage presents all imagery in black and white, […]. It also converts videos into storyboards (a series of still frames from the video in a grid pattern) so moderators can quickly understand what's happening without having to hear audio or view the scene in motion. And, there's a blurring functionality that can be used to conceal aspects of the image that are particularly graphic." *See* Exhibit A, at 3. Because of the use of this software, any subsequent government search necessarily exceeded the private search. And because WebPurify destroyed any record of whether and how this review was conducted, the government cannot meet their burden to show that the government search did not expand on the antecedent 'private' search.

In *Wilson*, the government's warrantless viewing "exceeded the scope of the antecedent private search" and "expanded the scope of the antecedent private search... thereby exceeding any earlier privacy intrusion" *Wilson*, 13 F.4th 961, 972. Here, because WebPurify's Montage obscures and modifies part of the photo, the subsequent search exceeds the earlier private search. If the image is altered prior to human review at WebPurify, the government cannot rely on the private search exception because the government would "learn new, critical information" from the original image that was never exposed to or uncovered by the private search. *Id.* Here, the publicly available information about Montage tells us that an altered version of the photo, including one with the graphic part blurred, was potentially the version submitted for human review. The government argues that "Det. Rosario did not exceed the scope of the WebPurify employee's private search, as he viewed the exact same file provided by Verizon […]." ECF Dckt. 59, p. 5, l. 9-10. However, as demonstrated herein, Det. Rosario certainly did not view the

"exact same" file at all. In fact, the government has no way of knowing what file that the content moderators at WebPurify looked at – but at the least, we know it was not the same one that Det. Rosario looked at. This is fatal to the government's case.

Accordingly, the government has not only failed to establish that an actual person at WebPurify specifically viewed the file in question but has also failed to demonstrate that law enforcement's subsequent search did not exceed any antecedent search conducted by WebPurify. The motion to suppress should be granted.

**C. This Court Should Conduct a Franks Hearing.**

The government argues that a *Franks* hearing is unnecessary because – even though Det. Rosario misrepresented certain facts to the Court – he did not do so intentionally or with reckless disregard. ECF Dckt. # 59, p. 5-6. The government says that because he simply relied on information of the NCMEC report, he was not reckless with regard to the truth. *Id*., ("Det. Rosario reiterated exactly what Verizon disclosed to NCMEC in CyberTip.") But the evidence demonstrates that he was not entitled to rely on the NCMEC report. For one, the NCMEC report expressly warned Det. Rosario that the information contained therein was not necessarily accurate. ECF Dckt. # 50-1, p. 2 ("NCMEC does not investigate and cannot verify the accuracy of the information submitted to the CyberTipline.") Second, the incident time and the report transmission occurred simultaneously. ECF Dckt. 50, p. 7. That timeline leaves no opportunity for human review. This information was apparent to Det. Rosario and should have alerted him that further investigation was needed before applying for a warrant. Yet, he incorrectly represented to the Court that a "Synchronoss Technologies, Inc representative viewed the files [sic] in question." ECF Dckt. # 50-1, p. 19. In *Franks*, the Supreme Court held that a defendant could challenge a facially valid affidavit by making a substantial preliminary showing that "(1) the affidavit contains intentionally or recklessly false statements, and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause." *United States v. Lefkowitz*, 618 F.2d 1313, 1317 (9th Cir.), cert. denied, 449 U.S. 824, (1980). Where the defendant makes such a showing, the Fourth Amendment requires that a hearing be held at the defendant's request. *Franks*, 438 U.S. at 155–56. If after the limited evidentiary hearing the court

concludes that the magistrate or judge in issuing the warrant was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth, then suppression is an appropriate remedy. *United States v. Leon*, 468 U.S. 897 (1984). Here, Det. Rosario simply copied information without actually processing the information contained in the NCMEC report. In doing so, he recklessly made false statements to the magistrate. For that reason, the Court should conduct a *Franks* hearing.

**D. Conclusion.**

The government has fallen far short of meeting its burden in this case. First, the third-party doctrine simply does not apply in this case because WebPurify was acting as a government agent when searching Mr. Sever's data. WebPurify cannot demonstrate they were acting as an independent agent nor that a person viewed the file in question prior to forwarding it to law enforcement. Second, WebPurify, despite having ample time and opportunity to produce any records to establish that an actual person actually viewed the entirety of the specific file at issue in this case, has failed to do so. Third, if human review occurred at all in this case, it was necessarily a diminished version of the file later reviewed by Det. Rosario. Thus, his subsequent search impermissibly expanded the initial private search.

Ultimately, the fact that Mr. Sever never posted, shared, or intentionally uploaded the photo to the internet underscores the weakness of the Government's theory. Accepting that theory would mean that merely accessing an internet-connected device—something cell-phone users routinely do without thought or intent—could constitute a relinquishment of Fourth Amendment protection over the files transmitted on that device. That result is difficult to reconcile with *Chatrie*, which cautions that "[a] cell-phone user is not to be viewed as sharing private information with third parties—which then can be freely passed on to the government—just by doing the ordinary things cell-phone users do." 146 S. Ct. at 2214–15. And the concern is particularly acute where, as here, modern devices routinely back up photos and other data to remote servers without any affirmative decision by the user to upload or share them. The Government's theory would transform these routine, often invisible functions of modern technology into a basis for searching private files—a result the Fourth Amendment does not

require.

For all of the reasons set forth above, and those set forth in Mr. Sever's motion to suppress, this Court should suppress the evidence obtained as a result of the warrantless search carried out by Fresno County Sheriff's Office Detective Rosario on or about June 27, 2024.

Respectfully submitted,

HEATHER E. WILLIAMS
Federal Defender

Date: August 21, 2026

*/s/ Griffin Estes*
GRIFFIN ESTES
Assistant Federal Defender
Attorneys for Defendant
DARREN SEVER