HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
GRIFFIN ESTES, CA Bar #322095
Assistant Federal Defender
Office of the Federal Defender
2300 Tulare Street, Suite 330
Fresno, California 93721-2226
Telephone: (559) 487-5561
Fax: (559) 487-5950

Attorneys for Defendant
DARREN SEVER

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DARREN SEVER,<br><br>Defendant. | Case No. 1:24-cr-00232-KES<br><br>REPLY TO GOVERNMENT'S SUPPLEMENTAL MEMORANDUM DCKT. 64<br><br>Date: October 13, 2026<br>Time: 11:00 a.m.<br>Judge: Hon. Kirk E. Sheriff |

On September 14, 2026, this Court held a hearing on Mr. Sever's motion to suppress. Dckt. 61. This Court informed the government that they had failed to meet their burden to show that the third-party doctrine applied to the WebPurify search of Mr. Sever's data in this case. The government was given a further opportunity to show that the search in this case complied with the Fourth Amendment. The government's supplemental filing fails to do so for three primary reasons.

First, the additional affidavits obtained by the government fail to address the Court's concern related to the volume of images the WebPurify content moderators are faced with. Jonathan Freger does not state how many files WebPurify's moderators review each day across the company, how many content moderators the company employs, or whether the particular moderators assigned to this contract also work on other contracts. The affidavit therefore

provides no meaningful basis to conclude that a human moderator actually reviewed the image at issue since the moderators are still tasked with reviewing overwhelming amounts of content.

Second, the Government's contention that WebPurify was not acting as an 'instrument or agent' of the state because it had a contractual relationship with Verizon sidesteps the main issue: the entity that conducted the search did so for the benefit of law enforcement and with law enforcement's acquiescence. *United States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir. 1994). The contractual relationship between WebPurify and Verizon does not resolve the separate question whether WebPurify was acting as an agent of law enforcement.

Third, the Government ultimately concedes that, assuming Detective Rosario viewed the photograph at issue, he viewed a materially altered version of that photograph. By viewing a color version of the photograph, he "exceeded the scope of the antecedent private search." *United States v. Wilson,* 13 F.4th 961, 972 (9th Cir. 2021).

**A. The Supplemental Affidavits Add Further Uncertainty to the Question of Human Review.**

The government's supplemental information falls far short of meeting their burden in this case. Indeed, Mr. Freger's declaration raises additional questions, but leaves open the fundamental issue raised by the Court at the September 14, 2026 hearing: whether it's plausible that a six-person team could truly accomplish this review and whether the assertion without evidence that the review occurred, is sufficient for the government to meet their burden. For one, although Mr. Freger states that there is a six-person team that accomplishes content moderation for Verizon, Dckt. 64-1, p. 15, ¶ 4, it's far from clear that the six-person team dedicates all their time to this contract. Mr. Freger's declaration appears to intentionally leave open the prospect that the team members assigned to the Verizon contract are engaged in other tasks, working on other contracts with the "hundreds" of other companies. Dckt. 60, p. 13, l. 20. Further, confusingly, Mr. Freger declares that only three people conduct the content moderation. Dckt. 64-1, p. 15, ¶ 4 ("three moderators.") This is in tension with his earlier statement that the "six content moderators would take turns in rotating" shifts. Dckt. 59-1, p. 3, ¶ 4. Acknowledging that the three other team members may also assist in content moderation, Mr. Freger fails to tell the

Court whether or not those moderators are working only on this contract, and how much review is actually occurring at WebPurify generally. This Court should be concerned about the sheer volume of content that the moderators are processing each day.[1] It remains implausible that they can personally review each file that passes through the company.

Moreover, Mr. Freger indicates that review takes "approximately 3-5 seconds." Dckt. 64-1, p. 16, ¶ 6. This is a cause for concern. Given that the images come to WebPurify pre-flagged as CSAM, it is entirely possible that the content moderators are not actually reviewing the images and instead relying on the pre-determined data that comes to them. If the image comes to WebPurify pre-marked as CSAM, Dckt. 64-1, p. 16, ¶ 3, and the moderator is only spending three seconds on the task, it's more likely than not that the content moderator simply clicks prompts without conducting a review. This is why the deleted log is so important for the government to meet their burden in this case. The company and the government have no way of telling us whether human review occurred on this occasion. Although there is no log documenting that review occurred in this case, the company nonetheless retained granular data related to the number of files received on any given day. Dckt. 64-1, p. 19. Mr. Freger appears to have actually spoken to the content moderation team about their review of content from June of 2024. CSAM, Dckt. 64-1, p. 16, ¶ 6. And, the content moderation team was able to remember how long their review of content from that time took on average during that time. *Id*. Yet, the content moderation team was unable to recall whether they reviewed the specific image at issue in this case.

The data provided by WebPurify raises concerns about the reliability of information sharing across the companies. For instance, the June 1 and June 2 figures presented in the table attached to Mr. Freger's declaration also call into question the reliability of WebPurify's data as a whole. WebPurify reports 889 images on June 1 and 1,098 on June 2. *Id*. Thus, more than half of the images attributed to the entire month of June are concentrated in two consecutive days, with no explanation in the data for why activity would increase so dramatically and then return immediately to substantially lower levels. That pattern matters beyond the accuracy of those two

[1] Mr. Ferger did not dispute that some moderators are permitted to opt-out of the content review process altogether. Dckt. 60, p. 14, l.1.

particular figures. Without evidence explaining how these figures were derived and what controls were used to ensure that images were consistently and accurately counted, the WebPurify's spreadsheet should not be treated as a reliable measure of the underlying activity. The statistical variances presented in the spreadsheet raises the specter that data sharing between the two companies is not occurring reliably. Moreover, the evidence presented by the government leaves open the possibility that Synchronoss files reports without sending the relevant image to WebPurify.

Curiously, the government obtained declarations from Verizon and from WebPurify, but not Synchronoss; this is perhaps because courts have already raised issues regarding whether Synchronoss actually does human review. *United States v. Crawford*, No. 3:18 CR 435, 2019 WL 3207854, at *2 (N.D. Ohio July 16, 2019)("But unlike Google, where employees confirm that images are child pornography before sending CyberTips to NCMEC, the Synchronoss system is automated. 'Once files are flagged as being potentially identified as child pornography, Synchronoss reports the information to [NCMEC]'. 'Synchronoss does not view any of the flagged files...and does not conduct any other type of review of the customer's account or storage.'")(internal citations omitted.) If Synchronoss hosted the file at issue in this case on their servers, they should be able determine whether they sent it to WebPurify. But the government instead presented the Court with evidence that whatever log that would prove this has been deleted, and available evidence from other cases suggests Synchronoss files NCMEC reports without human review after a file is automatically flagged.

**B. The WebPurify Search Was to Assist Law Enforcement.**

The government attempts to sidestep the centrality of WebPurify to the state-actor analysis by arguing that WebPurify is a contractor, and so their role, motivations, and coordination with the government are subsumed by the relationship they have with Verizon. This argument should be rejected. The government is relying on the WebPurify search to justify the application of the third-party doctrine. Neither Verizon nor Synchronoss conducted the search at issue. Thus, WebPurify's uncontested relationships with law enforcement and their established desires to assist law enforcement are what's at issue. The mere fact that WebPurify gets a

paycheck from Verizon to police content on their servers is irrelevant.

The government offers no evidence to contradict WebPurify's own statements that it acts in coordination with NCMEC. *See* Dckt. 60, p. 4-5. Even Jonathan Freger, whom the government has obtained two declarations from, does not deny that his company acts in coordination with law enforcement. *See*, Dckt. 59-1, p. 2-4, Dckt. 64-1, p. 15-17. Instead, the government argues that Mr. Sever "has not shown that WebPurify has had any interactions with the government that show the government knew or acquiesced to WebPurify's review on behalf of Verizon." Dckt. 64, p. 4, l. 9-10. To the contrary, the record contains ample evidence of coordination—WebPurify "work[s] closely with NCMEC" Dckt 60, p. 12, l. 5—and the government's burden shifting should be interpreted as a concession.

As argued previously, Dckt. 60, p. 10-11, this case is distinguishable from *United States v. Rosenow*, 50 F.4th 715 (9th Cir. 2022). For one, the evidence in *Rosenow* established that Yahoo and Facebook had independent business interests. *Rosenow*, at 733-734. There, the government obtained declarations from the companies setting forth those business interests. *Id.*, (referring to Yahoo's advertising revenue and Facebook's desire to attract users.) Here, on the other hand, the government obtained a declaration from Verizon, David Runyon, who does not indicate that Verizon's cloud service has a similar business interest to the companies in *Rosenow*. Dckt. 64-1, p. 2-3. Perhaps that's because Mr. Sever was not engaged in peer-to-peer file sharing. All Mr. Runyon indicates is that Synchronoss files Cybertips "as required by law." *Id.*, ¶ 4. This suggests more that Verizon searches its consumers data in order to comply with reporting requirements in 18 U.S.C. § 2258A rather than for some pure business motivation.

But the more important difference between this case and *Rosenow*, is that in *Rosenow*, the companies who conducted the search were the ones who had a business interest apart from locating evidence of criminal conduct. Here, WebPurify's reason for existing is to locate evidence of crime. *See* Dckt. 60, p. 3-12. For them, the economic motivation is secondary to their desire to catch people engaging in misconduct on the internet. In their words: "it's not about financial gain." ECF Dckt, 60, p. 8, l. 5. And WebPurify conducts the searches in coordination with NCMEC. None of those facts are contradicted by the government's reply or their additional

declarations. *See* Dckt. 64. The government's highlighting of Verizon's terms of service is a red-herring. *Id*., p. 4. Verizon did not conduct the search. Nor did Verizon 'remove', 'detect', nor 'report' anything at issue in this case notwithstanding the rights they reserve in their terms of service. Instead, they punted the task to WebPurify, a company that is effectively an arm of the government.

When a private actor undertakes a search pursuant to an established relationship with law enforcement, and with knowledge that law enforcement relies upon and acts upon the results of that search, the relevant inquiry is not simply whether the private actor had an independent commercial interest in identifying criminal activity. The question is whether, under the totality of the circumstances, the private actor was acting as an instrument or agent of the government. The government cannot transform what is functionally a government search into a private search merely because the entity conducting the search also has a financial or contractual interest in identifying and reporting suspected crimes. Such an approach would elevate form over substance and create an obvious end-run around the Fourth Amendment: the government could outsource investigative searches to private entities, coordinate with those entities, and then invoke the entities' private interests to avoid constitutional scrutiny. The Fourth Amendment does not permit the government to accomplish indirectly, through a private intermediary, what it could not constitutionally accomplish itself.

The government's reply does raise an additional question. If Synchronoss and WebPurify are flagging the hashmatched images through automated means, Dckt. 64-1, p.2, ¶2, and Dckt. 60, p. 10, why is human review necessary at all? The only reason is to assist law enforcement. The government gives the providers immunity by statute. 18 U.S.C. § 2258B(e). Thus, WebPurify's role appears to be completely an effort to further criminal prosecutions by attempting to establish compliance with *Wilson*. The company coordinates their searches using a government established database, for the sole purpose of assisting prosecutions. In sum, WebPurify is an agent of the state.

**C. The Government Fails to Show Whether The Image Det. Rosario Viewed Had Been Viewed by Content Moderators at WebPurify.**

The declaration by WebPurify makes claims that are unsupported by a factual record. Although WebPurify is able to pull detailed records regarding the number of files reviewed by the company on Verizon's behalf, Mr. Freger fails to provide configuration records related to their implementation of Montage, version history, release notes, administrator documentation or any internal documentation describing client-specific Montage configurations related to the Verizon contract that was in effect at the time of the search. The idea that moderators working at their desks are confronted with different client configurations of Montage for the hundreds of different clients throughout the day and are actually reviewing the photos on each instance continues to be implausible. Even if WebPurify was able to demonstrate that they had a 'no-blurring' configuration for the Verizon contract, such evidence would nonetheless fail to address the fundamental underlying issue in this case – the lack of evidence of what occurred in this case.

Did Synchronoss instruct WebPurify not to use all the tools on Montage that were supposedly available to protect the mental health of the content moderators? It's baffling that WebPurify would turn off the blurring functionality for their Synchronoss client but not others. How are we to know it was actually turned off on this occasion without the log that would be able to tell us what actually happened? Moreover, why would they turn off the blurring at all? If the company was concerned about the mental health of the content moderators, then turning off the blurring makes little sense. This is especially so when the photo has apparently gone through hashmatching and other forms of AI detection to confirm that it was CSAM.

Lastly, the second Freger declaration concedes that Montage had a mechanism for altering what a human reviewer saw. Dckt. 64-1, p. 17, ¶ 8. And that for this contract, the WebPurify employees did not see the same photo that was allegedly shown to Det. Rosario, if they saw it at all—the content moderators must have seen the photo in black and white. *Id*. But this too is troubling— viewing a photo in black and white is inherently limiting. At its core, this means that Det. Rosario "exceeded the scope of the antecedent private search" by obtaining more information than was available to the moderators. *Wilson,* 13 F.4th 961, 972. Once again, the failure of the government to present any information to tell us what actually happened on this occasion leaves the Court with no other option but to speculate as to what happened on this case.

Because of that, the government has failed to meet their burden of proof.

**D. Conclusion.**

In conclusion, the government has failed to assuage the very real concerns about the scope of this search and how it affects privacy in the digital age. As it relates to the facts of this case, the government has failed to meet its burden to show that the search in this case falls within the scope of the third-party doctrine. This Court should grant the motion to suppress.

Dated: October 2, 2026

Respectfully submitted,

HEATHER E. WILLIAMS
Federal Defender

*/s/ Griffin Estes*
GRIFFIN ESTES
Assistant Federal Defender
Attorneys for Defendant
DARREN SEVER